UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HEARTS ON FIRE COMPANY, LLC, <br><br>  Plaintiff, <br><br>  v. <br><br> CIRCA, INC., <br><br>  Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No.:  14-cv-11044-DLC <br> ) <br> ) **Leave to Reply Granted Nov. 28, 2016** <br> ) **(ECF No. 39)** <br> ) <br> ) <br> ) |

**REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF DEFENDANT'S EXPERT SHELDON KAWER**

This Reply is submitted in further support of HOF's motion to exclude the testimony and opinions of Sheldon Kawer and in response to the arguments raised by Defendant, Circa in its Opposition.[1]

HOF moves to exclude the opinions of Circa's purported expert, Sheldon Kawer, for three reasons. *First*, Kawer's opinions regarding barter industry standards and their application to the Agreement and the conduct of the parties in this case are not relevant to the determination of any factual issue in this action. Notwithstanding Circa's protestations to the contrary, this case does not present a contest between which of competing industry standards—advertising or barter—should apply to the Agreement and the performance of the parties' obligations. The jury can and will determine what the parties agreed to and whether Circa breached the contract based on the testimony of the parties, and it needs no assistance from an expert testifying about industry standards from either the advertising/media industry or the barter industry. Circa's

---

[1] Unless otherwise stated, this Reply uses the same defined terms as the Memorandum of Law in Support of Plaintiff's Motion to Exclude the Opinions and Testimony of Defendant's Expert Sheldon Kawer (the "Motion," ECF No. 37). Circa's Memorandum of Law in Opposition to Plaintiff's Motion to Exclude the Opinions and Testimony of Defendant's Expert Sheldon Kawer (ECF No. 40) is referenced as "Circa Opp."

attempt to inject barter industry standards into this case in an effort to make Kawer's testimony somehow relevant is fundamentally undermined by the fact that Circa has not introduced any evidence that HOF was an active participant in the barter industry, was aware of any barter industry standards, or had any reason to believe that any such standards guided its dealings with Circa. *Second*, Kawer's opinions are unreliable. Even with the benefit of an opposition brief and a supplemental affidavit (which should be excluded from the record),[2] Kawer's opinions remain fatally flawed examples of inadmissible *ipse dixit*. *Finally*, Kawer's opinions are unduly prejudicial; any purported probative value they may offer is far outweighed by the risk that the jury will give them undue weight.

As the proponent of Kawer's opinions, Circa bears the burden of laying a proper foundation for the relevance of Kawer's testimony and opinions. Unfortunately for Circa, calling a relationship "complex" does not constitute a foundation for expert testimony on industry standards where there is no evidence that the parties understood them to apply. Similarly, calling contract terms "ambiguous" does not make them so or make the terms subject to expert testimony. The truth of the matter is that HOF and Circa entered into a two-page letter agreement that provided Circa would secure advertising for HOF, and that HOF would pay Circa through a 50/50 mix of cash and merchandise credited at its wholesale value. The parties proceeded under this relationship for four and a half years. It was not until the parties mutually agreed to end the relationship and HOF began to source its own advertising that HOF realized Circa had not applied the parties' agreed-upon "reasonable" mark-up to the cost of advertising it charged to HOF, but rather a significantly higher and excessive mark-up. Significantly, at no point in their relationship did HOF and Circa ever discuss the existence of barter industry

---

[2] *See* HOF's Motion to Exclude the December 2016 Affidavit of Defendant's Expert Sheldon Kawer, filed together with this Reply.

standards, much less whether such standards applied to the Agreement or the parties' dealings. This fact alone is fatal to the admissibility of Kawer's opinions in this case.

## ARGUMENT

I.   **Kawer's Opinions are Irrelevant and Should Be Excluded Under FRE 702.**

Circa's opposition fails to carry the burden of proving the relevance of Kawer's opinions because Circa has not offered any evidence that HOF was familiar with the barter industry standards that Circa now seeks to impose, the contract did not reference any such standards, and there were no discussions between the parties about the application of such standards. Further, Circa's ancillary arguments for the relevance of Kawer's opinions are unavailing.

A.   **HOF Was Unfamiliar With Barter Industry Standards and Circa Cannot Prove Otherwise.**

As HOF argued in the Motion, Kawer's testimony on barter industry standards is only relevant if both parties were familiar with the barter industry such that they would have known that the standards of that industry would be applied to their agreement and relationship. *See* Motion, at 8-9 & n.10; *see also Bransford & Petz, P.C. v. Bank of Am. Commercial Fin. Corp.*, 2005 WL 1668224, at *9-10 (D. Mass. July 12, 2005)(excluding plaintiff's testimony concerning industry standards where the standards were not incorporated into the parties' agreement and where there was no evidence defendant was aware of the standards); *Fleet Nat'l Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 557-58 (1st Cir. 1995)(affirming exclusion of testimony concerning irrelevant industry standards); *Bushkin Assocs., Inc. v. Raytheon Co.*, 815 F.2d 142, 146-47 (1st Cir. 1987)(affirming exclusion of expert testimony concerning trade customs where

plaintiff failed to present sufficient evidence to justify an expectation that the customs would be observed in the transaction at issue).³

Circa attempts to satisfy this burden by relying on two facts: (i) HOF previously entered into a barter agreement with Active Media, and (ii) HOF acknowledges that the Agreement was a barter agreement and that it considered its relationship with Circa a barter arrangement. These facts, however, do not constitute a foundation for the introduction of expert testimony on barter industry standards under the controlling case law, which requires that "to be admissible, the usage not only must be universal, but has become notorious by the long and uniform practice of those engaged in the trade at the place where the contract is made." *Bransford & Petz*, 2005 WL 1668224, at *9-10 (quoting *Caggiano*, 327 Mass. at 579). It is undisputed that the Agreement does not expressly incorporate barter industry standards, there is no evidence that at any time during negotiation of the Agreement or thereafter the parties discussed the application of barter industry standards, and none of the HOF employees involved in the HOF-Circa relationship had any prior experience with barter arrangements. *See* Motion, at 7-8 & n.9. Nor has Circa introduced any evidence to prove that anyone at HOF understood the Agreement or the relationship would be governed by barter industry standards. The fact that at some point in the past HOF entered into a singular barter arrangement and that it acknowledges the Agreement

---

³ *See also Caggiano v. Marchegiano*, 327 Mass. 574, 579 (1951) ("It is true that unexpressed terms may be introduced into a contract by virtue of usage and custom, but such usage and custom must be universal and uniform. 'It is also as well settled that, to be admissible, the usage not only must be universal, but has become notorious by the long and uniform practice of those engaged in the trade at the place where the contract is made.'")(citing cases); *Doss v. Apache Powder Co.*, 430 F.2d 1317, 1322-23 (5th Cir. 1970)("To be relevant a custom must be 'reasonably brought home to the actor's locality' . . . and must be so general or well known that the actor may be charged with knowledge of it or with negligence in not knowing of it.")(citing Prosser, Torts, § 33 at 171 (3d ed. 1964)); *Home Ins. Co. v. Exch. Lemon Prods. Co.*, 126 F. Supp. 856, 857-58 (S.D. Cal. 1954), aff'd, 235 F.2d 558 (9th Cir. 1956) ("Trade usage in a particular trade is admissible where both parties are engaged in that trade. In such a case the parties to the contract are deemed to have used the disputed term according to the meaning or sense it bears in the trade. . . . That the instant action is not such a case is clear, for plaintiff is engaged in the insurance business and defendant in the business of marketing citrus products.");12 Williston on Contracts § 34:14 (4th ed.) ("Even though a usage is general in a particular business, a party that is not in that business will not be bound by it, absent knowledge or neglect of a duty to inform itself.").

with Circa to be a barter arrangement does not put HOF in the barter industry or charge it with responsibility for understanding and agreeing to the application of industry customs to its Agreement with Circa.  *Home Ins.*, 126 F. Supp. at 857-58.  Circa suggests that HOF should have known about the barter industry customs and practices and that its "ignorance was willful".  Circa Opp., at 6.  But Circa presents no evidence to support this, and it remains undisputed that HOF was not familiar with the barter industry or its customs.[4]  In such cases, courts in this district routinely exclude testimony concerning industry standards when there is no evidence that one of the parties was aware of such standards.  *See, e.g.*, *Bransford & Petz,* 2005 WL 1668224, at *9-10; *Bushkin*, 815 F.2d 142, 146-47.  The reasoning of *Bransford & Petz* applies with equal force here and Kawer's opinions must be excluded.

Finally, if Circa intended barter industry standards to govern the Agreement and the HOF-Circa relationship, then Circa was obligated to disclose this to HOF.  Indeed, Kawer himself recognizes that "the standards, customs, and practices of the barter industry where underperforming product is exchanged are frequently novel to even those persons who have significant overall business experience."  Kawer Affidavit ¶ 10.  Circa's failure to so notify HOF while simultaneously conducting itself according to standards that are not identified in the Agreement is just another example of Circa's deceptive approach to its dealings with HOF.

---

[4]  Circa's position also fails as a legal matter.  Not only has it neglected to address or refute HOF's case law, *see* Motion at 8-9 & n.10, but the cases cited by Circa for the admissibility of expert opinions concerning industry standards are inapposite because the parties in those cases did not dispute the relevance of such standards.  *See* Circa Opp., at 15 n.41; *see also Bacchi v. Mass. Mut. Life Ins. Co.*, 2016 WL 1170958, at *4 (D. Mass. Mar. 23, 2016)(Cabell, M.J.); *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981)(permitting defendant's expert to opine on industry standards in a case where there was no dispute whether such standards were relevant and, in fact, plaintiff had offered an expert "for substantially similar purposes").  Circa's cases on this point in the context of HOF's 93A claim are similarly irrelevant.  *See* Circa Opp., at 16 n.43; *see also James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.*, 112 F.3d 1240, 1251 (1st Cir. 1997)(no reliance on expert opinion in discussion of industry standards); *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass.App.Ct. 108, 125-26 (1989)(same).

**B.    Circa's Ancillary Arguments Do Not Establish the Relevance of Kawer's Opinions.**

Absent evidence of an actual meeting of the minds between HOF and Circa concerning the application of barter industry standards, Circa cites to a number of purportedly disputed factual issues that it believes establish the relevance of Kawer's opinions.  In most of those cases, Circa contends that HOF either distorts the record or misunderstands the function of a barter arrangement, and that Kawer's testimony, therefore, is critical to explain to the jury how the barter industry "really" works.  *See, e.g.*, Kawer Report, at 25-27 (Conclusion #3 asserts that there are no "mark-ups" in the barter industry and that Circa's profit on the overall relationship was, therefore, appropriate by barter industry standards).  But Circa's arguments actually show that the parties were not operating under a shared understanding of the Agreement or applicable industry standards, and that Circa was taking advantage of a non-barter industry party by unfairly and deceptively engaging in conduct that was plainly in violation of the parties' agreement.  Again this points to a lack of foundation and the irrelevance of Kawer's opinions to the facts and issues of this case.

HOF's Understanding of Advertising Industry Standards.  Circa argues it is entitled to rely on Kawer's opinions because "HOF's breach claim . . . depends entirely on industry standards, and whether advertising industry standards apply and could be expected to govern the *barter* arrangement between the parties . . . ."  Circa Opp., at 10; *see also id.* 11-12.  This is simply not true and, in fact, highlights the fundamental difference between the parties' positions in this action.  Unlike Circa, which would impose barter industry standards on the Agreement and the parties' relationship, HOF <u>does not</u> purport to impose advertising industry standards on the parties relationship or the Agreement.  Rather, HOF alleges that the parties understood the Agreement to limit Circa to a "reasonable" mark-up on the cost of advertising it charged to HOF.

Complaint ¶ 9.  This understanding and agreement was not based on any industry standard but rather on discussions between the parties about their agreement.  Caryl Capeci, HOF's President and Rule 30(b)(6) deponent testified as follows:

> Q. What is the basis for the allegation that the parties understood and agreed that Circa would include in its invoices a reasonable commission?
> A. It was the general understanding with Dave Zlochower and how he was working.
> Q. Okay.  Based on conversations with Dave Zlochower?
> A. Yes.  We never said exactly 10 percent, but we always said reasonable, yeah, commission or markup.
> Q. You used the phrase "reasonable commission" with Zlochower?
> A. Or "reasonable markup."[5]

HOF's understanding of a reasonable mark-up was principally informed by Ms. Capeci's and marketing director Julie Barry's experience in the advertising industry, and it believed Circa shared that understanding of reasonableness.[6]  But HOF does not contend (in the Complaint or in this Motion) that advertising industry standards are admissible to explain the parties' Agreement, much less that Circa's excessive mark-up on the cost of HOF's advertising constitutes a "breach" of such standards.  Consequently, Circa's contention that HOF's understanding of advertising industry standards renders Kawer's opinions admissible stands on faulty assumptions and should be disregarded.[7]

If anything, Circa's argument concerning advertising industry standards further proves the absence of any foundation for Kawer's opinions—i.e., the parties clearly lacked any shared understanding of the applicability of barter industry standards.  Where there is no shared understanding that certain industry standards should or will apply, what the parties intended, how

---

[5] Capeci Tr., at 86:21-87:8 (Ex. G, ECF No. 37-5).
[6] *Id.*; *see also* Complaint ¶ 8 (Ex. 20, ECF No. 40-1).
[7] Circa's reliance on *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 286 F.R.D. 266 (W.D. Pa. 2012), is mis-directed for related reasons.  *See* Circa Opp., at 12.  In *Carnegie Mellon*, the moving party did not dispute the relevance of industry standards to the underlying issues; rather, the moving party argued that the expert opined on the wrong industry standard.  Consequently, this decision has no bearing on HOF's argument, which is that the issues in this action do not require any expert guidance.  *See* Motion at 8-9; *see also supra* Part I.A.

the contract should be construed, and whether Circa's conduct was unfair and deceptive should only be assessed by the jury and the Court based on the testimony of the parties and the evidence of how they treated the agreement. *SEC v. Goldsworthy*, 2008 WL 2943398, at *4 (D. Mass. Jan. 3, 2008)("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge.  In neither case do [courts] permit expert testimony.")(quoting *Marx & Co., Inc., v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977).  In fact, to the extent Circa argues that without Kawer's testimony, the jury will have no reference point for determining whether its conduct was deceptive or unfair, *see* Circa Opp., at 16, the jury can assess the testimony and evidence from the parties to determine whether Circa was unfair or deceptive. Applying industry standards that the parties did not agree would apply impermissibly puts Kawer in the position of telling the jury what it must conclude.  *See* Motion, at 9-10; *see also* Kawer Report, at 26 ("traditional advertising agency standards, which are always in the context of paying for advertising with cash only, have no applicability to a barter arrangement in which the Client pays with product").

<u>The Agreement Is Unambiguous</u>.  Circa also argues it is entitled to rely on Kawer's opinions because the Agreement's terms are "ambiguous, undefined, and hardly straightforward."  Circa Opp., at 12.  Circa cites no legal authority for its finding of ambiguity. Instead, Circa relies on the fact that HOF acknowledges that the parties dispute certain terms in the Agreement—specifically the term "media costs"—and the incorrect assertion that HOF's witnesses "disagree" on the meaning of "media costs."  *Id.*, at 4, 12.  Controlling authority provides that the fact that two parties dispute the meaning of a contract term does not render the term or the contract ambiguous. *Dasey v. Anderson*, 304 F.3d 148, 158 (1st Cir. 2002)(citing *Citation Ins. Co. v. Gomez*, 426 Mass. 379 (1998))  Rather, "the actual meaning of a contractual

8

provision which can *reasonably* accommodate two or more interpretations should be left to the jury." *Fleet Nat'l Bank*, 45 F.3d at 556. Further, with respect to the purported "disagreement" in the testimony of HOF's witnesses, Circa pretends there is controversy where there is none. As a threshold matter, Circa did not, in fact, ask most of HOF's witnesses for their understanding of the definition of the term "media costs."[8] To the extent HOF's witnesses testified on their understanding of HOF's arrangement with Circa, they consistently testified that that Circa had agreed to secure advertising for HOF at the lowest possible cost, and that Circa was entitled to add a reasonable mark-up to that cost.[9] Without more, Circa's conclusory assertion that the Agreement (or the term "media costs") is ambiguous and that Mr. Kawer must be permitted to "educate" the jury about the correct meaning of the term "media costs" with reference to its meaning in the barter industry has no merit.

There Is No Controversy Concerning the "Remarketing Guidelines". The Agreement contains "Remarketing Guidelines" that provide: "[HOF] [p]roducts will not be sold through department stores, national jewelry chains, independent jewelers, online jewelry merchants that represent a direct from the manufacturer relationship . . . or accounts currently or, during the course of the agreement, doing business with you."[10] These remarketing guidelines were negotiated and agreed to by the parties at the time the Agreement was executed.[11] Circa contends that "the parties disagree on the meaning and significance" of the remarketing guidelines' and asserts that Kawer's opinions are necessary to explain these terms. *See* Circa Opp., at 13. A cursory review of the testimony cited, *see id.*, at 13 n.34, makes it clear that Circa

---

[8] *See, e.g.*, Supplement to Capeci Deposition ("Capeci Supp. Tr."), at 66:23-68:6 (attached hereto as <u>Exhibit J</u>).
[9] *See* Barry Tr., at 83:14-23 (Ex. C, ECF No. 37-3); Capeci Supp. Tr., at 75:14-76:16; Maloney Tr., at 44:12-19 (Ex. D, ECF No. 37-4).
[10] *See* Agreement, at 58567 (Ex. A, ECF No. 37-1).
[11] *Compare* <u>Exhibit K</u>, CIRCA_119, at 123-24 (providing HOF's revisions to the draft agreement, including revisions to the remarketing guidelines), *with* Ex. G, at 5520 (ECF No. 137-7)(Circa accepting HOF's revised draft).

is trying once again to create disagreement where there is none in order to have Mr. Kawer resolve this disagreement with reference to barter industry standards.  Ms. Capeci testified that for HOF the remarketing guidelines' restrictions—on the channels of trade through which Circa could resell HOF's merchandise—were necessary to protect HOF's unique relationships with its retail partners.[12]  Ms. Capeci further testified that she was unaware of the impact of those restrictions on Circa because HOF had no knowledge of the channels of trade that Circa would utilize to sell the jewelry.[13]  Mr. Zlochower, the Circa employee responsible for the HOF relationship, testified that the remarketing guidelines prohibited Circa from selling to certain "tiers" of retailers.[14]  There is no disagreement in this testimony; rather, Capeci and Zlochower provided their understandings of the ways a shared term affected their respective businesses.  Nothing here requires expert testimony.

      <u>Mr. Kawer's Barter Industry "value proposition" Does Not Apply Here</u>.  Circa further contends that Kawer's "explanations of the barter 'value proposition' as understood and practiced in the barter industry, of the typical purposes and benefit of barter, and of the typical value to both parties of the product used as payment will be indispensable to helping the jury make a factual determination."  Circa Opp., at 14.  According to Kawer, a fundamental component of the barter "value proposition" is that clients like HOF provide barter agents like Circa "underperforming" merchandise that would otherwise garner 5-15% of wholesale on the market.  Kawer Report, at 5.  In the context of barter, clients receive a credit equivalent to the merchandise's wholesale value, which credit the client can then spend toward advertising or other services.  *Id.*, at 5-6.  According to Kawer, underperforming merchandise used in barter transactions "is always worth a fraction of wholesale".  *Id.*, at 6.

---

[12]  Capeci Supp. Tr., at 69:10-70:12 (Ex. J).
[13]  *Id.* at 68:14-20, 70:13-17.
[14]  Deposition of David Zlochower ("Zlochower Tr."), at 273:22-274:24 (attached hereto as <u>Exhibit L</u>).

10

Testimony by Kawer on the barter "value proposition" has no place in this case. First, it is clear that HOF did not approach this Agreement or its relationship with Circa from the perspective of this barter "value proposition." No one at HOF believed that the "opportunity goods" that HOF provided to Circa were "worth a fraction of wholesale." Indeed, it is clear that these "opportunity goods" were far more profitable than the underperforming merchandise with which Kawer is familiar. HOF has marshaled substantial evidence and supporting testimony to demonstrate that, when HOF sold identical opportunity goods—i.e., identical SKUs—through other closeout channels, it regularly received wholesale price for that merchandise.[15] Under these circumstances, there is no foundation for Kawer to testify and offer opinions about the "value proposition" of barter where Kawer's opinion is fundamentally at odds with the record concerning the merchandise at issue.

The Agreement Does Not Limit Circa's Overall Profit Margin. Finally, HOF does not allege in the Complaint or argue in the Motion that Circa was limited to a 10-15% profit on its relationship with HOF. Circa Opp., at 14-15. Further, contrary to Circa's claim that HOF "shifted its focus" from "commission" to "mark-up," *id.*, at 15, HOF has been clear about its theory—i.e., that Circa would earn revenue from the parties' relationship from both a "reasonable" mark-up on the cost of advertising and the resale of HOF merchandise—from the outset of the litigation. To understand this, the Court need look no farther than Paragraph 10 of the Complaint, where HOF alleges the parties understood that "Circa would benefit from the Agreement by earning a reasonable commission for its [advertising] placement services and a profit from the sale of the merchandise that it received from HOF . . . ." Complaint ¶ 10 (Ex. 20, ECF No. 40-1); *see also id.* ¶ 9 ("both parties understood and agreed that Circa would include in its invoices a reasonable commission for its placement services, and that this commission would

---

[15] *See generally* Exhibit M, HOF_58969.

11

equal between 10% and 15% of the cost of the advertising"). Thus, the purported need for Kawer to opine on artificial limits on Circa's profitability when there is no evidence to support such a claim is a straw man that does not require expert testimony.

### C. Kawer's Impermissible Legal Conclusions, Factual Conclusions, and Assumptions About HOF's State of Mind Justify Excluding His Opinions In Their Entirety.

Circa barely addresses HOF's arguments that Kawer's opinions repeatedly and impermissibly interject factual conclusions, legal conclusions, and assumptions about HOF's state of mind, and Circa makes <u>no</u> effort to address or distinguish the case law supporting these arguments. *See* Motion, at 10, 11-12, n.12, n.13, 12-13. Instead, Circa effectively concedes these deficiencies[16] and suggests the Court limit the offending opinions in lieu of excluding Kawer's opinions entirely. *See* Circa Opp., at 17 & n.46. For the reasons outlined in the Motion, *see* Motion, at 9-10, 10-12, 12-13, the Court can and should exclude Kawer's opinions in their entirety.[17]

---

[16] The majority of the cases cited by Circa for the proposition that experts may offer factual conclusions or reach ultimate legal issues actually support HOF's position. *See* Circa Opp., at 10 & n.28; 17 n.46; *see also Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997)(holding that expert "transgressed" the principle that experts may not opine on legal matters before concluding reversal was unnecessary due to harmless error); *LaSalle Bank Nat'l Assoc. v. CIBC Inc.*, 2012 WL 466785, at *10 (S.D.N.Y. Feb. 14, 2012)(excluding expert because there was no evidence that the underlying agreement's clear terms required explanation from an expert). The other cases cited by Circa are inapposite for the simple reason that the parties did not dispute the relevance of industry standards in those cases. *Equal Employment Opportunity Commission v. Texas Roadhouse, Inc.*, 2016 WL 6134123, at *11 (D. Mass. Oct. 19, 2016); *Bacchi*, 2016 WL 1170958, at *4; *Ji v. Bose*, 538 F. Supp. 2d 354, 358 (D. Mass. 2008); *Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l*, 851 F.2d 540, 544 (1st Cir. 1988)(concerns an irrelevant challenge to "factual basis" under Federal Rule of Evidence 703); *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006); *U.S. v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991).

[17] Two of Circa's own cases support this conclusion. *See* Circa Opp., at 10 n.28; *see also U.S. ex rel. Dyer v. Raytheon Co.*, 2013 WL 5348571, at *8-10, 12-16 (D. Mass. Sept. 23, 2013)(rejecting *Daubert* challenge that was based on unrelated factual grounds, and striking <u>in its entirety</u> a report that contained legal and factual conclusions and insufficient methodology); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 528-30 (S.D.N.Y. 2001)(excluding <u>in its entirety</u> an expert opinion that was "permeated with legal opinions and conclusions" and offers factual conclusions "without the benefit of citation to research, studies, or other generally accepted support for expert testimony).

## II.     Kawer's Supplemental Affidavit Is Equally Irrelevant and Should Be Excluded.

In an effort to salvage Kawer's opinions, Circa filed an Affidavit of Sheldon Kawer (the "Kawer Affidavit," ECF No. 41) that Circa offers in opposition to the Motion, *see* Kawer Affidavit ¶ 2, and as a supplement to the Kawer Report, *see* Circa Opp., at 18 n.49.  HOF has separately moved to exclude the Kawer Affidavit under Fed. R. Civ. P. 37(c)(1).  Independent of that motion, the Court also should exclude the Kawer Affidavit pursuant to Federal Rule of Evidence 702 and *Daubert* because the affidavit suffers from the same failings present in the report it purports to supplement.

<u>Irrelevance</u>.  The Kawer Affidavit offers no additional evidence that HOF was an active participant in the barter industry, was aware of any barter industry standards, or had any reason to believe that any such standards guided its dealings with Circa.  For the reasons discussed in Part I, above, the Kawer Affidavit can and should be excluded on these grounds alone.

<u>Impermissible Factual Conclusions</u>.  In his affidavit, Kawer also continues to reach factual conclusions drawn from evidence that the jury will be perfectly capable of interpreting without expert testimony.  For example, the Kawer Affidavit states:

- "The value of the barter exchanges in this case, along with the conduct of the parties to the Agreement, can be understood and assessed *only by reference to the value proposition that attends the use of product as payment*, and more specifically underperforming product as payment."  Kawer Affidavit ¶ 6 (emphasis added).

- ". . . HOF's claims are based on valuation assumptions that apply to all-cash purchases of advertising, but that cannot be applied to barter arrangements when assessing the value of the product being used as payment, either as an expense to the Client or as a receivable to the Barter Company."  *Id.* ¶ 11.

These statements go well past the point of identifying industry standards and instead dictate how the jury should interpret the evidence.  For the reasons explained in the Motion, such factual conclusions are patently inappropriate and should be excluded.  *See* Motion, at 9-10.

Impermissible Legal Conclusions. The Kawer Affidavit also offers the same species of impermissible legal conclusions that render the Kawer Report inadmissible. Remarkably, in his affidavit, Kawer even goes so far as to offer legal conclusions on the merits of the Motion itself. For example:

- "HOF's arguments are without merit. . . . [B]ecause the deal in question undisputedly involved exchanging goods (jewelry) for barter trade credits that were used to purchase media placement—as opposed to purchasing media placements with all cash—*the only industry whose standards and practices could conceivably be relevant is the barter industry*." Kawer Affidavit ¶ 4 (emphasis added).

- "Barter industry standards are the only industry standards under which the barter agreement between HOF and CIRCA reasonably can be analyzed, and *if any industry standard was violated, it can only have been a barter-industry standard because the relationship involved the use of product as payment*." *Id.* ¶ 6 (emphasis added).

- "One simply cannot assess the conduct and claims of the parties in this case or in any barter relationship without reference to [barter industry] principles." *Id.* ¶ 28.

- "[T]he customs and practices of the industry *must be explained to a lay juror* who has never been involved in the industry to help the juror understand the unique value exchange in a barter deal and to assess the parties' conduct and claims in connection with the relationship." *Id.* ¶ 30 (emphasis added).

- "In sum, in my experience type of Agreement [sic] and business relationship at issue in this case and the conduct of parties in the context of such a relationship *are always governed and assessed by reference to barter industry standards*." *Id.* ¶ 34 (emphasis added).

As HOF previously argued, legal conclusions are not the proper domain of an expert, particularly when it is a matter of interpretation of an agreement, or the parties' rights and obligations under an agreement. Motion, at 11-12 & n.12 & 13. The decision in *Pearlman v. Cablevision Systems Corporation*, 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015), is particularly instructive on this point, as it concerned an expert whose opinions concerning industry customs amounted to an instruction to the jury on what was necessary for a party to fulfill its obligations under a contract. The Kawer Affidavit also should be excluded for this reason.

**III.  Kawer's Methodology Remains Flawed**

It appears Circa's primary motivation for filing the Kawer Affidavit is an attempt to repair the obvious methodological deficiencies in Kawer's Report that the Motion identified—i.e., that the Kawer Report fails to identify a single secondary source that articulates or even supports Kawer's so-called barter industry standards.  As noted above, HOF has separately moved to exclude the Kawer Affidavit.

If the Court agrees that the Kawer Affidavit should be excluded, then this determination is a simple one.  In the Motion, HOF cites controlling authority—most notably *Barletta*—in which courts in this Circuit excluded expert opinions under conditions nearly identical to those before this Court.  *See* Motion, at 13-14 & n.15.  Circa studiously avoids any discussion of the controlling case law and instead relies on inapposite authority.[18]  *See* Circa Opp., at 18 & n.48 & 49.  Circa also argues that Kawer's experience alone is a sufficient basis for the industry standards he purports to describe.  Other courts in this District have rejected that exact argument.  Specifically, in *Dyer*, Judge Woodlock rejected the argument that "an expert may rely exclusively on his experience in *asserting* an expert opinion in a report without reference to any authoritative source," and excluded the expert's report in its entirety.  2013 WL 5348571, at *15-16 (emphasis in original).

Further, even if the Court permits Circa to supplement the Kawer Report with his affidavit, that still does not repair Kawer's methodological failings.  The documents that Kawer

---

[18] *See* Circa Opp., at 18 n.47.  *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999), raises completely unrelated issues.  General Motors did not argue *ipse dixit*, it argued that the expert had merely performed calculations, not analytical work.  The court disagreed, finding that the expert economist had digested "numerous economic analyses," 73 F. Supp. 2d at 459, of "complex financial matters" (*id.* at 461) that would not otherwise be readily accessible to a jury.  In *Pearlman*, 2015 WL 8481879, at *3-4, the expert had been an employee of defendant for over 20 years, had negotiated some of the agreement terms at issue, and had testified before various regulators on issues relevant to the case.  Thus, the expert's testimony concerned the agreements at issue as much as it concerned common practices, so her experience sufficiently established reliability.  *Id.*, at *7.

appends to his affidavit to validate his statements and conclusions of barter industry standards do not, in fact, support those standards.

Kawer identifies six "general standards and practices" of the barter industry in the Kawer Affidavit:

> (1) the basic process of how the exchange of goods and trade credits in a barter deal works; (2) the purposes and benefit of barter for the Client; (3) the general type and value of the inventory used in barter, *i.e.* a fraction of the wholesale value of the inventory, which is directly relevant to the value the parties realize from a barter arrangement; (4) the confidentiality of the barter company's rates; (5) the lack of a standard invoice 'markup' or profit margin; and [6] [sic] the freedom of the company providing inventory as payment to negotiate the price it pays to the barter company.

Kawer Affidavit ¶ 9.  <u>None</u> of the exhibits attached to Kawer's affidavit support the standards and practices 3, 4, and 6 in Kawer's list.

It also merits emphasizing that the term "media costs" does not appear and is not defined in the IRTA glossary of barter terminology that Kawer refers to in his affidavit, *see* Kawer Affidavit ¶ 14, or in <u>any</u> of the exemplars of industry standards he attaches to the Kawer Affidavit.  This is a significant hole in the materials that Kawer purports to rely on.  The meaning of "media costs" is a critical issue of dispute in this case and Circa proposes to have Kawer resolve this dispute (in CIRCA's favor, of course) by instructing the jury how the term must be read.  Circa Opp., at 4.  According to Kawer "media costs" is "commonly used in barter agreements," and participants in the industry would read it "to refer to the cost HOF (the Client) agreed in advance to pay CIRCA for advertising pages, not the amount CIRCA paid to the publications to purchase the advertising."  Kawer Report, at 21; *see also id.* at 10.  The fact that this "commonly used" term does not appear in <u>any</u> of the industry materials that Kawer has identified is a ringing indictment of his methodology and further demonstrates that Kawer's opinions are based on nothing other than his say-so.

16

Most importantly, the resources Kawer relies on to support his so-called barter industry standards are in many respects in conflict with his statements and conclusions. One of them—the Active International "C-Suite Guide"—contradicts Kawer's standards.[19] Throughout his report, Kawer insists that the merchandise at issue in barter transactions is "always worth a fraction of wholesale." Kawer Report, at 6; *see also id.* at 7, 22-25 (Conclusion #2); Kawer Affidavit ¶ 9. The C-Suite Guide contradicts that opinion, recognizing that barter transactions do not exclusively rely on "underperforming" merchandise; rather, they can rely on a range of assets:

> **You don't need to have an asset problem to take advantage**
>
> Companies without any asset problems whatsoever use Corporate Barter as a tool to reduce advertising expenses by trading in their first-line inventory in exchange for media Trade Credits.
>
> Corporate Trade also addresses situations that occur in the normal course of business: sales targets to be hit, product packaging is redesigned; weather is unseasonal; fashions evolve; consumer shopping patterns change.

C-Suite Guide, at 8 (emphasis in original).

> You can trade almost any asset imaginable to earn Trade Credits. Plus, you can use your Trade Credits to fund what your business really needs, through Corporate Trade purchases.
>
> You don't need an inventory or asset problem to strike a Corporate Trade transaction. In fact you don't necessarily need to have a problem at all.
>
> Assets can be anything from tier one inventory, capital equipment to excess real estate to product labeled with expired promotions. And if you don't have inventory now, Corporate Trade firms can fund and trade your media while you provide inventory at a later date.

---

[19] HOF notes that the version of the C-Suite Guide attached to the Kawer Affidavit as Exhibit 2 omits page 8 of the guide. A true and complete copy of the C-Suite Guide is attached hereto as Exhibit N, (available at: https://www.irta.com/wp-content/uploads/2016/01/Active-International-eBook-The-C-Suite-Guide-to-Corporate-Trade.pdf) (last accessed Jan. 13, 2017).

17

*Id.*, at 10.

In sum, given the opportunity to resuscitate his faulty methodology, Kawer has instead directed the Court to a resource that directly contradicts one of the central tenets of Kawer's opinions. As such, even with the benefit of the Kawer Affidavit, Kawer's opinions still fail to articulate a reliable methodology and should be excluded.

## IV.     Undue Prejudice.

Circa has failed to effectively address HOF's argument concerning the undue prejudice that would arise if Kawer were permitted to testify before a jury. Once again, Circa has ignored HOF's case law, *see* Motion, at 15-16, and instead submitted completely irrelevant case law of its own.[20]

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exclude the Opinion and Testimony of Defendant's Expert Sheldon Kawer should be granted.

Dated January 13, 2017

---

[20] *See* Circa Opp., at 19 n.50 & 20 n.52; *see also Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 77-80 (1st Cir. 2009)(in case where industry standards were not at issue, reversing trial court's exclusion of a product defect expert under Fed. R. Civ. P. 26, not Fed. R. Evid. 403); *Licciardi v. TIG Ins. Grp.*, 140 F.3d 357 (1st Cir. 1998)( in case where industry standards were not at issue, reversing trial court's decision to allow testimony from medical expert who changed his testimony without making necessary disclosures under Fed. R. Civ. P. 26(e)).

**HEARTS ON FIRE COMPANY, LLC,**

Respectfully submitted,
By its attorneys,


 /s/ *Robert P. Sherman*
Robert P. Sherman (BBO No. 458540)
Miles D. Norton (BBO No. 670225)
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000


**CERTIFICATE OF SERVICE**


I, Miles D. Norton, hereby certify that a true copy of the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent by first-class mail to those indicated as non-registered participants on January 13, 2017.

 /s/ *Miles Norton*
Miles D. Norton


138905570.4