UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEARTS ON FIRE COMPANY, LLC<br><br>    Plaintiff,<br><br>v.<br><br>CIRCA, INC.,<br><br>    Defendant. | No. 14-cv-11044-DLC |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT'S EXPERT SHELDON KAWER (DKT. NO. 36); AND PLAINTIFF'S MOTION TO EXCLUDE THE DECEMBER 2016 AFFIDAVIT OF DEFENDANT'S EXPERT SHELDON KAWER (DKT. NO. 48)**

CABELL, U.S.M.J.

The present lawsuit arises from a contract in which Hearts on Fire, LLC ("HOF") agreed to provide jewelry to CIRCA, Inc. ("CIRCA") in exchange for trade credits and media advertising. CIRCA was also permitted to charge a reasonable commission based on the cost of the media placement services. HOF contends that CIRCA charged an unreasonably high commission and alleges breach of contract and violation of M.G.L. c. 93A. HOF has moved to exclude the opinions and testimony of CIRCA's expert as contained in his initial report as well as his supplemental affidavit. For the reasons discussed below, both motions are DENIED to the extent the expert would intend to merely testify regarding industry

standards and practices, but ALLOWED to the extent the expert would intend to offer legal conclusions or opinions as to HOF's state of mind.

## I. **RELEVANT BACKGROUND**

### A. The Agreement

The parties entered into a letter agreement (the "Agreement") in June 2009. (Compl. ¶ 3). Under its terms, HOF was to provide CIRCA with wholesale merchandise, namely jewelry and diamonds, in exchange for trade credits based on the value of the merchandise provided. HOF could in turn then use the trade credits to obtain media advertising through CIRCA. (Id. ¶ 5). In addition, HOF reserved the right to direct CIRCA to purchase media advertising on its behalf, half of which HOF would pay for in cash and half of which could be invoiced against HOF's trade credit account. (Id. ¶¶ 6-7). In exchange for the media related services CIRCA would provide, the parties understood and agreed that it would charge HOF a "reasonable commission," although the Agreement did not explicitly indicate what that commission would be. (Id. ¶ 9). In December of 2009, the parties expanded the terms of the Agreement to allow HOF to obtain additional trade credits in exchange for additional wholesale merchandise. (Id. ¶ 12).

Shortly after consummating the Agreement, HOF directed CIRCA to purchase and place advertising on its behalf. (Id. ¶ 11). CIRCA's invoices to HOF did not specify the cost of the advertising

CIRCA placed or the commission it charged, because it claimed that the information was proprietary. (Id. ¶ 13). HOF alleges that CIRCA's commission was per se unreasonable under the Agreement because the commission was roughly equivalent to one half of the amount HOF would have paid had it purchased advertising space directly from the media outlet. (Id. ¶ 16). As noted above, the complaint alleges breach of contract and violation of M.G.L. c. 93A.

B. The Kawer Report (Dkt. No. 37-2)

In the course of discovery, CIRCA disclosed an expert report written by Sheldon Kawer (the "Kawer Report"). Kawer is a consultant in the barter industry and CIRCA retained him to assess whether "CIRCA violated accepted customs and practices in the barter industry." Kawer's testimony is predominantly based on 48 years of professional experience in the barter industry, during which he was responsible for structuring and negotiating barter deals, drafting barter agreements, consulting clients, and purchasing magazine and advertising space on behalf of his barter clients. The Kawer Report contains an extensive explanation of the barter industry as a whole, including its customs, practices, and standards, as well as the process and principles of a barter transaction. In pertinent part, the Kawer Report discusses the term "media costs" in the context of a barter agreement, and how

3

a media advertising transaction is generally structured under a barter agreement.

The Kawer Report opines that CIRCA acted in accordance with barter industry standards in the course of its relationship with HOF. More particularly, the Kawer Report opines that: (1) the Agreement is a standard barter agreement in "most respects;" (2) documents and testimony from HOF executives show that the value of the products HOF used to compensate CIRCA was substantially below wholesale value, and HOF therefore obtained a significant advantage when it used its product as a form of payment; (3) CIRCA's profit and invoice markup did not violate barter industry standards; (4) HOF had the opportunity to freely negotiate the pricing of the services provided by CIRCA and to accept or reject its terms accordingly, which, as Kawer contends, is a standard practice in the barter industry; and (5) HOF was free to purchase advertising on its own rather than through CIRCA, which, as Kawer contends, is also a standard practice in the barter industry.

    C. <u>The Kawer Affidavit (Dkt. No. 41)</u>

HOF moved to exclude the Kawer Report (Dkt. No. 36) and CIRCA responded by opposing the motion and attaching an affidavit submitted by Kawer (the "Kawer Affidavit"), presumably to address the alleged deficiencies HOF noted in its motion to exclude. (Dkt. No. 41). In pertinent part, the Kawer Affidavit reiterates and elaborates upon the opinions and conclusions asserted in the Kawer

4

Report. In response to HOF's contentions that the Kawer Report is largely grounded on his own "say-so" without any supporting sources, Kawer explains that:

> the standards, customs, and practices of the barter industry are not contained in peer reviewed articles or other academic sources and are not the result of any formal testing that can be replicated or reproduced. Instead, the industry has evolved over time through practice, and [Kawer] ha[s] learned the barter business, and the customs and practices of the industry, through engaging in hundreds of barter deals.

(Dkt. No. 41, ¶ 7).

The Kawer Affidavit also avers that, independent of Kawer's extensive professional experiences in the field, there is "ample evidence" that a distinct barter industry exists, in the form of "industry pamphlets, websites, and other informal resources," which barter trade associations and major barter companies typically rely on. (Id. ¶ 12).

The Kawer Affidavit also outlines the particular methodology Kawer employed in forming his opinions and conclusions. It explains that he conducted: (1) a careful review of the evidence in the record with respect to the parties' conduct and claims; (2) an analysis of the nature of the Agreement and the business relationship between the parties as to assess whether barter industry standards are applicable to the parties' conduct; and (3)

an analysis of the parties' conduct in the context of the barter industry's standards, customs, and practices. (Id. ¶ 33).

HOF moved to exclude the Kawer Affidavit on the ground that it is untimely because it was served after the deadline for expert disclosures, undermines the court's professed goal of streamlining discovery, and fails on its merits for the same reasons that the Kawer Report fails. (Dkt. No. 48).

## II. **LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In applying Rule 702, the district court serves as the gatekeeper for expert testimony by ensuring that [it] . . . both rests on a reliable foundation and is relevant to the task at hand." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016) (*quoting Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993)). *See also Bogosian v. Mercedes-Benz of N. Am.*, 104 F.3d 472,476 (1st Cir. 1997) (testimony is "helpful to the trier of fact" where it is relevant and "rests on a reliable

foundation"). "In carrying out this responsibility, the trial court must bear in mind that an expert with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony as long as the testimony has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 115 (1st Cir. 2010) (*quoting* Fed. R. Evid. 401). "The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance." *Fertik v. Stevenson*, No. 12-10795-PBS, 2016 WL 4148193, at *2 (D. Mass. Aug. 4, 2016) (*quoting Milward*, 820 F.3d at 473). "A district court enjoys substantial discretion to decide whether to admit or exclude relevant expert testimony." *Pages-Ramirez*, 605 F.3d at 115.

## III. **ANALYSIS**

Reading the Kawer Report and Affidavit together, Kawer intends to opine in broad terms that the Agreement is a barter transaction governed by barter industry standards, that the commissions CIRCA charged for its media placement services were reasonable under barter industry standards, and that CIRCA therefore did not breach the Agreement. Before addressing the propriety of this anticipated testimony, the court stresses that its ruling on the motions is not meant to signal or rule that any

7

particular industry standard should govern the interpretation of the Agreement.  That issue is not presented by the present motions and remains an issue for the trial.

Turning then to the motions, HOF argues that the opinion testimony contained in the Kawer Report should be excluded on relevance grounds because the Agreement can be understood without the assistance of expert testimony, and because there is no overt evidence that the Agreement is governed by barter industry standards.  HOF also argues that Kawer's anticipated testimony as reflected in the Kawer Report is based on an unreliable methodology, offers impermissible factual conclusions intruding on the jury's fact-finding role, and offers impermissible legal conclusions regarding HOF's state of mind, its conduct and its liability.

As noted above, CIRCA subsequently submitted the Kawer Affidavit in part to respond to HOF's arguments.  For that reason, the court pauses to first consider whether the Kawer Affidavit should be excluded as HOF urges.  HOF argues among other things that the Kawer Affidavit is untimely because it was served after the expert discovery deadline of September 21.  The court finds, however, that the Kawer Affidavit is not untimely.

Under Fed. R. Civ. P. 26(a), a party who has disclosed the identity of its expert witness must accompany that disclosure "with a written report, prepared and signed by the witness . . . [that]

8

must contain a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). A party who has made such a disclosure under Rule 26(a) has an ongoing duty to "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." *See* Fed. R. Civ. P. 26(e)(1)(A). A party is not permitted to submit a supplemental expert report after the end of expert discovery if the supplement "differs substantially from the report, offers a whole new theory, opinion, or methodology, or is outside the scope or general scheme of the report." *Mass. Mutual Life Ins. Co. v. DB Structured Products, Inc.*, No. 11-30039-MGM, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (*citing Macaulay v. Anas*, 321 F.3d 45, 52 (1st Cir. 2003); *Thibeault v. Square D Co.*, 960 F.2d 239, 247 (1st Cir. 1992)). However, "a late expert declaration submitted in response to criticisms of the expert's opinion or methodology contained in a *Daubert* motion . . . is permissible as long as it is consistent with the overall opinion or methodology in the original report and merely provides additional subsidiary details, support or elaboration." *Mass. Mutual Life*, 2015 WL 12990692, at *4 (*citing Curet-Velazquez v. Acemla De Puerto Rico, Inc.*, 656 F.3d 47, 56 (1st Cir. 2011)). *See also Zeolla v. Ford Motor Co.*, No. 09-40106-FDS, 2013 WL 308968, at *10 (D. Mass. Jan. 24, 2013) ("the bar on late

supplemental expert reports does not preclude either party from submitting additional affidavits intended to establish the reliability of proffered opinions in response to a motion to exclude").

In the present case, the Kawer Affidavit, while unquestionably submitted after the deadline, does not materially differ in substance and effect from the Kawer Report. Nor does it offer a wholly new theory, opinion, or methodology than those contained in the Kawer Report. Rather, it provides evidence that helps to establish the reliability and credibility of the opinions offered in the Kawer Report. As courts have found this to be an appropriate basis to allow a party to submit a supplemental affidavit past the expert discovery deadline in response to a motion to exclude, there is no basis to find that CIRCA ran afoul of the pertinent rules of procedure here. *Mass Mutual Life*, 2015 WL 12990692, at *4; *Zeolla*, 2013 WL 308968, at *10.

To be sure, HOF argues independently that it will suffer prejudice if the Kawer Affidavit is not excluded because the disclosures in the affidavit will hamper HOF's ability to effectively prepare its theory of the case. The court does not find this argument compelling. As the Kawer Affidavit was served well before trial, which to date has not yet been settled, and echoes for the most part the findings in the Kawer Report, any prejudice HOF might suffer is minimal at best.

Against this backdrop, the court finds that Kawer's anticipated testimony, as reflected by the Kawer Report and Affidavit read in tandem, is relevant and reliable, and there is no basis to exclude it to the extent it sets forth opinions regarding descriptions of industry customs and practice, or opinion testimony that might help a court or jury understand the evidence. However, the court will exclude those portions of the materials that contain legal argument, legal analysis, legal conclusions, or speculation about HOF's state of mind, because such material is outside the permissible scope of expert opinion.

A. Kawer's Anticipated Testimony is Relevant

"To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)(*citing Daubert*, 509 U.S. at 591-92; Fed. R. Evid. 402)). "The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is [w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." *U.S. v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995)(*quoting*

*U.S. v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994)). Where expert testimony does not relate to an issue in the case "it is not relevant and, ergo, non-helpful." *McGovern ex rel. McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418, 423 (D. Mass. 2008).

Kawer's testimony is relevant here because it could help the jury in determining what a reasonable commission rate would be if the jury were to conclude that the transaction generating the commission was a barter transaction governed by barter industry standards. To that extent, even accepting that the jury might choose not to credit such testimony, there is a basis in the record to support CIRCA's effort to characterize the Agreement as one that should be governed by barter industry standards. Among other things, after executing the Agreement in June 2009, HOF drafted an expansion which the parties signed in December 2009. The expansion indicated that "CIRCA and [HOF] entered into [the Agreement] regarding a *barter* transaction for a specific amount of merchandise . . . [and] that all *barter* transactions agreed to by the parties will be subject to the terms of the Agreement." (Dkt. No. 37) (emphasis added). *See F.D.I.C. v. Singh*, 977 F.2d 18, 21-22 (1st Cir. 1992) ("[W]hen several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together."); *Matthews v. Planning Bd. of Brewster*, 72 Mass. App. Ct. 456, 463 (2008) ("[I]nterlocking documents [that] are

part of a single transaction and are interrelated in purpose must be read together to effectuate the intention of the parties"). Moreover, HOF's Vice President, who signed the Agreement on HOF's behalf, agreed at her deposition that there was a "barter component" to the Agreement.[1] (Dkt. No. 37-4). Further, while less significant, HOF's own counsel acknowledged at the deposition of HOF's CEO that there was no dispute that the Agreement is a "barter deal." [2] (Dkt. No. 37-9).

HOF suggests that the Agreement is an "exceedingly simple" document that does not require expert interpretation. While that

---

[1] The deposition transcript of HOF Vice President Ellen Maloney indicates, in pertinent part, as follows:
    Q: Ms. Maloney, again, prior to June 26, 2009, in the discussions you mentioned having about [sic] potential relationships with CIRCA, did you discuss with [the President of HOF] barter deals in general?
    A: To the best of my recollection, the only *barter deal* discussion we had was in relation to CIRCA.
    Q: Okay. Describe those discussions.
    A: I was not – I was aware that there was a *barter component*, but that was not my area of responsibility or oversight at the time.
Dkt. No. 37-4 (emphasis added).

[2] The deposition transcript of HOF Chief Executive Officer Glenn Rothman indicates the following exchange between counsel for HOF and counsel for CIRCA:
    Counsel for HOF: I know it's a barter deal. I understand that. I have read the contract. Right? We don't have a disagreement with that.
    Counsel for CIRCA: Okay. Well, I'm glad you're clear about that, because I didn't know if you were disputing that it's a barter deal.
    Counsel for HOF: Not in any way.

Dkt. No. 37-9.

may be so, the jury still might appreciate more rather than less evidence on this issue, and testimony as to industry standards, customs, and practices is commonly admitted. *See Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare in civil litigation."); *Pelletier v. Main Street Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006) (same). Moreover, expert testimony as to the applicable industry practice is particularly relevant here, as adherence to those industry standards is recognized as one factor to be considered in determining liability under chapter 93A. *See James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.,* 112 F.3d 1240, 1251 (1st Cir.1997).

To be clear, though, this does not mean that a party must introduce expert evidence as to how to interpret the Agreement. Rather, it is left to each party to decide the type of evidence that would be necessary to make its case to the jury.

B. <u>Kawer's Anticipated Testimony is Reliable</u>

HOF contends that Kawer's methodology is based on an unreliable foundation because: (1) he failed in the Kawer Report to identify any evidence of scientific testing or peer review with respect to the barter industry; (2) he failed in the Kawer Report to offer any evidence that the purported barter industry standards he discusses are in fact accepted within the barter industry; and (3) he failed in the Kawer Report to cite to any supporting

14

secondary sources such as manuals or industry publications. (Dkt. No. 37). When read in conjunction with the Kawer affidavit, however, the court finds that Kawer's anticipated testimony is on balance sufficiently reliable.

In considering whether an expert opinion rests on a "reliable basis," the Supreme Court has articulated four general guidelines: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; (4) the existence of standards controlling the technique's operation; and (5) the level of the theory or technique's acceptance within the relevant discipline." *U.S. v. Monteiro*, 407 F. Supp. 2d 351, 357 (D. Mass. 2006) (*citing Daubert,* 509 U.S. at 593-94). "These factors, however, are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability." *U.S. v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002).

Where, as here, an expert opinion is predicated on experience, "[t]he critical inquiry is whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Monteiro*, 407 F. Supp. at 357 (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)). In large part, Kawer grounds his opinions and conclusions in his forty year-plus

professional experience in the barter industry, during which he engaged in hundreds of barter negotiations and transactions on behalf of his clients. (Dkt. No. 41). Assuming *arguendo* that Kawer's experience and knowledge as set forth in the Kawer Report were not sufficient standing alone to meet the standard for admissibility under Rule 702, the Kawer Affidavit additionally provides a list of objective, third-party barter industry sources which confirms the existence of the barter industry and lends support to his anticipated testimony.

To be sure, the Kawer Affidavit notes that the barter industry is not subject to peer review in the traditional sense, so that it is not scientifically possible to determine what a "reasonable" barter industry markup would be in the first instance. HOF would certainly be free to explore the significance of this deficiency on cross-examination but the court does not find that it should serve to categorically disqualify Kawer from testifying in light of his considerable experience in the barter industry. *See DaSilva v. American Brands, Inc.*, 845 F.2d 356, 361 (1st Cir. 1988) (admitting testimony of expert who had 23 years of experience in relevant field and familiarity with relevant industry principles).

### C. But, Kawer Cannot Offer Legal Conclusions Or Speculate As To HOF's State Of Mind

"It is black-letter law that [i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the

judge." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (*quoting United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995)). Furthermore, experts cannot testify on an opposing party's intent or state of mind. *Bacchi*, 2016 WL 1170958, at *3. Therefore, to the extent that Kawer would intend to offer such testimony, such testimony would be categorically improper and the Report and Affidavit should be stricken to the extent they contain such provisions. Accordingly, Kawer cannot testify that the Agreement is governed by barter industry standards. He also cannot testify that HOF's position was unreasonable, or that CIRCA's position was reasonable. Finally, he cannot testify that CIRCA did not breach the Agreement.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, HOF's Motion to Exclude the Opinions and Testimony of Defendant's Expert Sheldon Kawer is DENIED in part and ALLOWED in part (Dkt. No. 36), and HOF's Motion to Exclude the December 2016 Affidavit of Defendant's Expert Sheldon Kawer is DENIED in part and ALLOWED in part (Dkt. No. 48).

*SO ORDERED.*

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: September 29, 2017